Filed 4/26/22  P. v. Parkinson CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B310482 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA435437) |
| v. | |
| HAROLD PARKINSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Kathleen Kennedy, Judge.  Affirmed.

Sara H. Ruddy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1980, Stephanie Sommers (Sommers) was raped and murdered in her home. With the forensic capability at the time, law enforcement was unable to identify the killer, and the case was unsolved for many years.

In 2004, the Los Angeles Police Department (LAPD) was able to produce a partial DNA profile of Sommers's killer from a swab taken from her body. In 2014, that profile was compared to, and matched, a reference sample of defendant and appellant Harold Parkinson's DNA.

On January 21, 2016, defendant was charged by indictment with murder (Pen. Code, § 187, subd. (a)),[1] with the special circumstance allegations that he was engaged in the commission of rape (§ 190.2, subd. (a)(17)) and that he had previously been convicted of second degree murder (§ 190.2, subd. (a)(2)). It was further alleged that defendant personally used two deadly and dangerous weapons, to wit a knife and a weight, in the commission of the murder (§ 12022, subd. (b)(1)).

Following a jury trial, defendant was found guilty of first degree murder, and the rape-murder special circumstance and weapon allegations were found true. Defendant admitted the prior conviction special circumstance.

Defendant was sentenced to life in state prison without the possibility of parole, plus two years for the weapon enhancement.

Defendant timely appealed. On appeal, he argues that (1) the trial court erroneously excluded third party culpability evidence; (2) the trial court erroneously admitted evidence of the victim's statements about her sexual orientation under exceptions to the hearsay rule; (3) the prosecutor erred in closing

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

argument; and (4) the cumulative effect of these errors compels reversal.

We are not convinced by defendant's arguments. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Sommers's life in the years before she was murdered*

Sommers was married for one or two years in the early 1970's. After the marriage ended, Sommers lived with her sister for a few months. Sommers was a very clean and neat person. At some point, she moved to an apartment in Van Nuys. Sommers was a heavy smoker.

Sommers worked at a Hamilton smog check facility in Canyon Country. Her coworker, Charles Bryant (Charles),[2] lived with his wife, Debra Bryant-Shiner (Debra),[3] in an apartment in Van Nuys. Sommers socialized with them occasionally when she lived in Van Nuys. According to Debra, they were acquaintances with Sommers but not close friends. Debra did not remember seeing Sommers bring anyone to her apartment.

Sommers once had a three-way sexual liaison with Charles and Debra. It was brief and unsuccessful. According to Debra, Charles did not have sexual intercourse with either woman. According to Charles, he had sexual intercourse with Sommers, but not Debra. Charles thought Sommers was more interested in his wife than in him. He believed that Sommers was more

---

[2]     Charles was called as a witness by the defense. The defense presented no other evidence.

[3]     For clarity, we refer to Charles Bryant and Debra Bryant-Shiner by their first names. No disrespect is intended.

comfortable with Debra because they talked on the phone a lot and went shopping together.

A neighbor who lived near Sommers in the Van Nuys apartment complex attended social gatherings at the Bryants' apartment. At one of these gatherings, Sommers told him that she was gay.

Sommers worked with Martha Hurtado (Hurtado) and Patricia Roukens (Roukens), and they became friends. Hurtado and Roukens had been in a relationship and lived in an apartment on Marathon Street in Silver Lake. Hurtado and Sommers discussed sexual orientation, and Sommers told her that she liked women and was a lesbian. Sommers said that she felt free to talk to Hurtado because she was also a lesbian.

Sommers and Roukens had several conversations, and Roukens believed they each were aware that the other person was a lesbian. They had one sexual encounter together. Sommers told Roukens that she was a lesbian and was not attracted to men.[4] They talked about the attractiveness of women, and when Sommers talked about men, she would "shudder."

Sommers wanted to leave her Van Nuys apartment. Roukens also wanted to move, and she sublet her Marathon Street apartment to Sommers while she was on vacation. Sommers moved to the apartment in May 1980.

The Marathon Street apartment was on the first floor. There was no air conditioning, and when it was hot, Roukens

---

[4] During the course of his investigation, LAPD Detective Robert L. Camacho interviewed Roukens. She told him that Sommers had told her that she had feelings for Debra.

4

would open the windows and the front door, keeping only the screen door locked. There were no bars on the windows, and the screens were easy to remove. Roukens felt safe in the area. Sometimes Sommers left her door slightly open, and Hurtado told her to be careful and keep her doors locked.

Debra last spoke to Sommers on Wednesday, August 27, 1980, at around 8:00 p.m. The next day, Thursday, August 28, 1980, Roukens saw Sommers at work.

Sommers had plans to go with her nephew to Magic Mountain that weekend, but she never arrived to pick him up. She did not answer when her nephew called on Friday. Debra called Sommers on Thursday and Friday, but received no answer.

When Sommers's family members were unable to reach her, they called the police. A neighbor also called 9-1-1.

2. *Discovery of Sommers's body*

Sommers was found dead in her Marathon Street apartment on Saturday, August 30, 1980. Detective Camacho and his partner, Richard Fox, responded to the apartment at 11:55 p.m. and found it in disarray. Trash and cigarette butts were on the floor. A cat litter box was jarred out of place in the hallway, and the box contained sunglasses. Sommers's underwear was lying on the floor of the hallway leading to the bedroom, and her shorts were on the bedroom floor. A necklace with a broken chain was lying under the underwear. A rug by the entrance was disturbed, and items that appeared to have been hanging on the wall were lying on the floor.

Sommers was discovered on her back on the bed in her bedroom. Her head was covered with a pillow, a towel, and a blanket. She was naked from the waist down. There was a kitchen knife on her chest, and an 8.8-pound gym weight was

5

next to her head.  A work-out bench was nearby in the bedroom.
Sommers had several stab wounds in her belly and chest area,
and there was a large gash or hole in her head above her left eye.
There was blood spatter on the wall, and blood on the floor.
There were no signs of forced entry.

3. *Autopsy evidence*

Sommers's body was brought to the coroner's department
on August 31, 1980.  The level of decomposition made it difficult
to see any trauma to her body.[5]  Sexual assault kit evidence was
collected on September 2 and 4, 1980, and the autopsy was
performed on September 4, 1980.  The autopsy was performed by
deputy medical examiner Dr. Eugene Carpenter, who died before
trial.  Deputy medical examiner Dr. Kevin Young reviewed the
autopsy report, photographs, and other documents prepared in
connection with the autopsy.  Based on these materials,
Dr. Young reached an independent determination that the cause
of death was fatal stab wounds and blunt force injury, and the
manner of death was homicide.

Sommers suffered multiple fractures to her facial bones
and forehead caused by blunt force trauma.  Dr. Young believed
that these injuries were the result of more than one forceful blow.
The injuries could have been caused by the weight found next to
her head.

Sommers also suffered multiple stab wounds to the torso.
Dr. Young counted 16 stab wounds on the photos taken at the

---

[5]     Toyetta Beukes, the Director of the Sexual Assault
Response Team at San Gabriel Valley Medical Center, testified
that 50 percent of patients that come in for a sexual assault exam
have a normal genital exam with no signs of trauma.  The lack of
injury does not preclude forcible rape.

autopsy. The stab wounds penetrated her heart, both lungs, and bowel. The wounds could have been inflicted by an eight-inch knife, similar to the one found on Sommers's chest.

4. *Forensic evidence collected in 1980*

Fingerprints were collected from items found inside Sommers's apartment. There were no prints on either the knife or the weight. Prints on other items did not match anyone other than Sommers.

The sexual assault kit collected on September 2, 1980, contained a nipple swab, an oral swab, an anal swab, an external genital swab, and a vaginal swab, as well as a pubic hair and vaginal aspirate. Smears were made from the oral, anal, vaginal, and external genital areas. This kit was later designated as item 14.

A second sexual assault kit collected at the time of the autopsy on September 4, 1980, contained oral, anal, and vaginal swabs, as well as smears of all these areas. This kit was later designated as item 10.

Notes showed that the swabs were not tested in 1980. DNA analysis was not advanced in 1980. Blood analysis done in 1980 was inconclusive.

In October 1980, Lee Edward Mann (Mann), a forensic scientist with the LAPD crime lab, received item 10 from the coroner's office. It contained six slides and six swabs, two each from Sommers's oral, vaginal, and anal cavities. He examined the six slides for sperm cells, but was unable to detect any.

5. *Defendant's residence in 1980*

In 1980, defendant resided on Willowbrook Avenue, approximately one mile from Sommers's apartment.

6. *Investigation by the cold case unit*

In 2001, the LAPD established a cold case homicide unit whose mission was to reevaluate approximately 9,000 unsolved homicides that occurred between 1960 and 1996. Sommers's case was assigned to Detective Timothy Marcia, who requested DNA analysis of one of the sexual assault kits in Sommers's case.

In 2004, criminalist Alexa Calderaro (Calderaro) reexamined the sexual assault kit (item 10) that had been previously analyzed by Mann. She found spermatozoa on the vaginal slide. Technological advances had made it possible to discover the presence of DNA where it was not previously. Calderaro packaged and sent the remaining swabs to the California Department of Justice laboratory for further testing.

In June 2004, criminalist Amy Rojas (Rojas) performed DNA analysis on the swabs sent by Calderaro. She obtained a single source male partial profile from the sperm cells, indicating that the DNA came from one individual. Rojas sent the results of the DNA testing to LAPD.

In May 2013, an investigative lead identified defendant as a potential suspect. Police reinterviewed everyone they thought could have knowledge about the case, including Roukens, Hurtado, and the Bryants. They showed all the witnesses they interviewed a photograph of defendant taken close to the date of the murder; no one recognized him as an acquaintance of Sommers.

Detective Marcia was then the coordinator of the cold case homicide unit and assigned the case to Detective Richard Bengtson. After obtaining a DNA sample from defendant, Detective Bengtson submitted those samples for DNA analysis and comparison with DNA collected from Sommers.

In 2014, Rojas received from LAPD a swab containing a buccal sample from defendant. Rojas compared this DNA reference sample for defendant with the vaginal swab sperm sample from the 2004 test, and found that they matched. The DNA profiles were consistent at all corresponding locations. The odds of identical profiles occurring at random among unrelated individuals were one in 720 billion for African-Americans, one in 20 trillion for United States Caucasians, and one in 17 trillion for Southwest Hispanics.

In 2014, criminalist Stephanie Tan (Tan) prepared several evidentiary items from this case for DNA analysis. She examined a cutting from Sommers's underwear found on the floor and detected nucleated epithelial cells but no sperm. Sperm are more durable than epithelial cells, so if there had been any sperm present, Tan would likely have found them. Sommers's shorts also tested negative for sperm.

DNA analysis was done on several other items collected at the scene of the crime, including a cigarette, knife, weight, and fingernail scrapings. These tests did not result in DNA typing, most likely due to the passage of time and the fact that not much DNA was deposited on the objects originally.

Following the match between defendant's DNA and DNA found on Sommers's vaginal swab, defendant was arrested in June 2014.

In 2018, Detective Bengtson became aware of the second sexual assault kit (item 14) in the case. That kit was also tested. Forrest Yumori (Yumori), the lead DNA analyst with the LAPD crime lab for this sexual assault kit, performed the analysis of the DNA data gathered from the swabs from the external genital, vaginal, and anal areas. Male DNA was detected on the anal

swab and the external genital swab, but no sperm. The vaginal swab tested positive for sperm. The amount of sperm detected in the vaginal sample was higher than would be expected if a woman had walked around for days with semen in her vagina. Over time, the amount of foreign DNA in a person's body decreases, and any semen present would drain out.

Yumori determined that DNA from both defendant and Sommers was present in the external genital sample. The probability of randomly finding defendant's DNA profile in a population would be one in two billion. Male DNA in the vaginal sample matched defendant's DNA profile on all 23 loci. The frequency of such a match was greater than one in one septillion.

## DISCUSSION

I. *The trial court properly excluded the proffered third party culpability evidence because it failed to link the third party to the murder*

Defendant contends that the trial court erred when it excluded evidence supporting the possibility that another individual, Dennis Castro (Castro), might have been responsible for Sommers's rape and murder.

A. Relevant facts and proceedings

Before trial, the prosecutor moved to exclude evidence of alleged third party culpability. The motion discussed several individuals who were investigated for possible involvement in the murder. Among these was Castro, an insurance salesman who was referred to Sommers by his cousin and Sommers's friend, Robin Friar (Friar). Castro met Sommers at her home on August 28, 1980, at approximately 4:00 p.m. to discuss insuring her vehicle. Castro told police that he had never met Sommers before that day. They had a friendly conversation. At one point,

10

she asked him to look at her barbells and a photograph in her bedroom. When the phone rang, he picked it up and handed it to Sommers. Castro denied having sex with Sommers and stated he left her apartment at about 5:20 p.m.

Castro learned of Sommers's death from his cousin. He contacted Detective Fox on September 2, 1980, and provided details of his interaction with Sommers. On September 12, 1980, Castro submitted to a polygraph examination but could not complete it. During the examination, he mentioned that Sommers had been stabbed and hit with a weight. His knowledge of some facts about Sommers's death, in addition to the subsequent discovery that his fingerprints matched those recovered from a drinking glass in Sommers's apartment, led investigators to believe that he might have been involved in her death.

Castro told police that Sommers gave him a glass of water during their appointment. And he said that he learned of the details of the murder from Friar. Investigators interviewed Friar and confirmed that she had learned the details of the murder on September 9, 1980, from Dr. Quigley, a chiropractor who treated both Friar and Sommers. Dr. Quigley had learned of the details of the murder from the coroner's office and then shared them with Friar, who then shared them with Castro.

On November 5, 1980, Castro took another polygraph examination and passed it. Other than the glass, Castro's fingerprints were not found anywhere else in Sommers's apartment.

During the hearing on third party culpability evidence, defense counsel argued that Castro was in Sommers's apartment, was one of the last people to see her alive, and was aware of some

facts of her death before they were disclosed. The prosecutor noted that Friar had told Castro of the details shortly after the murder.

The trial court found that the defense had not established a connection between any of the individuals, including Castro, to the crime, and granted the motion to exclude third party culpability evidence.

B. Relevant law

"'"[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime. . . ."'" (*People v. Young* (2019) 7 Cal.5th 905, 937.) "'[E]vidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime. . . .'" (*People v. Clark* (2016) 63 Cal.4th 522, 598; see also *People v. Abilez* (2007) 41 Cal.4th 472, 517.) "'"In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352."'" (*People v. Young*, *supra*, at p. 937.) The trial court's ruling is reviewed for abuse of discretion. (*People v. Clark*, *supra*, at p. 598.)

"[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion

12

([Evid. Code,] § 352)." (*People v. Hall* (1986) 41 Cal.3d 826, 834; *People v. Dworak* (2021) 11 Cal.5th 881, 895.)

Evidence Code section 352 provides the trial court with broad discretion in assessing whether the probative value of particular evidence is "'substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Mills* (2010) 48 Cal.4th 158, 195.) We review the trial court's exercise of discretion in admitting or excluding evidence for abuse of discretion, and we will not disturb the trial court's ruling except on a showing the trial court acted in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*Ibid.*; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

C. <u>Analysis</u>

Applying these legal principles, we readily conclude that the trial court did not err. The evidence of Castro's involvement with Sommers was minimally relevant, if at all, to the issues at trial. There was no evidence that connected Castro to Sommers at the time of her death or suggested that he had any motive or opportunity to kill her. Castro stated that he was last at Sommers's apartment on Thursday at 5:20 p.m. Debra called Sommers later that evening and the next day but got no answer. Sommers's nephew called her the next day and did not speak to her. While it is likely that Sommers was murdered sometime between Thursday night and Friday night, there is no definitive time of death. There is no evidence that Castro, unlike defendant, was in Sommers's bedroom when she was murdered.

13

Defendant speculates in trying to connect Castro to the murder. But, following investigation, it was clear that Castro's knowledge of some of the facts of the murder had been obtained from his cousin through the coroner's office, soon after Castro learned of Sommers's death.

Additionally, defendant claims that Castro's presence in Sommers's bedroom, and defense counsel's proffer that Castro told the police that Sommers came on to him, leads to a "plausible scenario" whereby Sommers invited Castro in for sex, changed her mind, and Castro then became angry and killed her with the weight and a knife.

The proffered evidence only showed that Castro was present with Sommers at the murder scene at some point in the day or two leading up to the murder. Because the trial court reasonably concluded that the proffered third party culpability evidence failed to directly or circumstantially link Castro to the actual perpetration of the murder, the trial court properly exercised its discretion in excluding the evidence. (See, e.g., *People v. Kerley* (2018) 23 Cal.App.5th 513, 573–574; *People v. Clark*, *supra*, 63 Cal.4th at p. 598 [evidence that third party visited victim's home on same day as alleged actual killer did not show anything more than opportunity]; *People v. DePriest* (2007) 42 Cal.4th 1, 43 [evidence that another person "had some 'remote' connection to the victim or crime scene[] is not sufficient to raise the requisite reasonable doubt"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1175 [evidence inadmissible as third party culpability evidence because it only showed motive and opportunity, and did not show the person was involved with the murder]; *People v. Geier* (2007) 41 Cal.4th 555, 582–583.)

The trial court was also well within its discretion in excluding any evidence as to Castro pursuant to Evidence Code section 352. (*People v. Mills*, *supra*, 48 Cal.4th at p. 195; *People v. Carter* (2005) 36 Cal.4th 1114, 1166.) As set forth above, the evidence had limited or no probative value on the issue of third party culpability. Defendant's proffered evidence about Castro's possible involvement risked using a large amount of trial time to delve into insignificant facts. While the polygraph evidence was inadmissible, defendant would presumably present evidence that Castro mentioned some details about the murder to investigators. The prosecution would then have to present testimony to explain that Castro learned of these details from his cousin, who had learned them from her chiropractor, who had learned them from an acquaintance in the coroner's office. The additional evidence would have been time-consuming and confusing for the jurors, while providing minimal, if any, relevance to the issues at trial.

In addition, we reject defendant's claim that the exclusion of third party culpability evidence violated his constitutional right to present a defense. The ""'ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense,'"" and courts retain ""'a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.'"" (*People v. Lawley* (2002) 27 Cal.4th 102, 155; *People v. Lucas* (1995) 12 Cal.4th 415, 464; *Crane v. Kentucky* (1986) 476 U.S. 683, 689–690; *Holmes v. South Carolina* (2006) 547 U.S. 319, 327–328 & fn. * [noting that the rule set forth in *People v. Hall*, *supra*, 41 Cal.3d at p. 833 has been widely accepted].)

15

D.  <u>Any evidentiary error was harmless</u>

Even assuming without deciding that the trial court erred in excluding this evidence, that error would have been harmless under any standard in light of the overwhelming evidence of defendant's guilt.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

The issue of defendant's identity as the killer was conclusively established by the forensic evidence that his DNA matched DNA found inside the vagina of the victim.  The DNA profiles were consistent at all corresponding locations.  The odds of identical profiles occurring at random among unrelated individuals were one in 720 billion for African-Americans, one in 20 trillion for United States Caucasians, and one in 17 trillion for Southwest Hispanics.  Following the 2018 analysis of the second sexual assault kit (item 14), defendant's DNA was found in the external genital sample.  The probability of randomly finding defendant's DNA profile in a population would be one in two billion.  Male DNA in the vaginal sample matched defendant's DNA profile on all 23 loci.  The frequency of such a match was one in greater than one septillion.

This DNA evidence proves that defendant had sex with Sommers at around the time she was murdered.  The vaginal swab in the second sexual assault kit tested positive for defendant's sperm.  The amount of sperm detected in the vaginal sample was higher than would be expected if a woman had walked around for days with semen in her vagina.  Over time, the amount of foreign DNA in a person's body decreases, and any semen present would drain out.  But there was no sperm found in the external genital sample, the anal sample, or on the

16

underwear that was found on the floor near her bed. Defendant's sperm was found nowhere else near Sommers's body other than in her vagina. If Sommers had had sex with defendant and then gotten up before being killed, defendant's sperm would have likely been present in some amount on the external areas of her body and her underwear.

This evidence indicates that Sommers did not get up after having sex; rather, she was either raped and then murdered, or beaten unconscious and/or killed and then raped. Indeed, the level of defendant's sperm present in Sommers's vagina, and not present elsewhere, combined with the state in which Sommers's apartment was found, and the manner in which her body was found—on the bed with her face covered and naked from the waist down—indicates that defendant must have raped Sommers after Castro had left her apartment.

II. *The trial court properly admitted evidence of Sommers's statements about her sexual orientation*

Defendant contends that the trial court erred in permitting the prosecutor to introduce out-of-court statements made by Sommers about her sexual orientation under hearsay exceptions.

A. <u>Relevant facts and proceedings</u>

Before trial, the prosecutor moved to admit Sommers's statements about her sexual orientation and her feelings for Debra under various hearsay exceptions. The prosecutor argued that in order to explain the presence of defendant's sperm in Sommers's vagina, the defense would contend that she engaged in sexual intercourse with men, based upon Sommers's one sexual encounter with the Bryants. The prosecutor intended to introduce evidence that Sommers was a lesbian and harbored romantic feelings towards Debra pursuant to the state-of-mind

17

exception to the hearsay rule (Evid. Code, §§ 1250, 1252). Sommers's statements to her friends and family about her sexual orientation were relevant in establishing her lack of interest in men and the unlikelihood that she consented to sexual intercourse with a man who was a stranger to her.

Defendant objected, arguing that a person's sexual orientation is not the same as her state of mind. The prosecutor contended that Sommers's statements were trustworthy and fell under well-established exceptions to the hearsay rule.

The trial court determined that the fact that Sommers came out to her family and said she was a lesbian was admissible. It then noted that homosexuals in the 1970's were subject to more discrimination than today, leading it to conclude that Sommers's statements about her sexual orientation were admissible as statements against interest under Evidence Code section 1230. The trial court stated: "I think people who were homosexual were largely in the closet and would do anything to hide the fact that they were homosexual for fear of rejection, hatred, ridicule, ostracization, whatever, by family, by friends, co-workers. Whoever."

Furthermore, it found that Sommers's statement to Roukens that she had no interest in men and that she had feelings for Debra was admissible under the state of mind exception to the hearsay rule. It also found Sommers's statement to Roukens that Sommers would "shudder" at the thought of finding a man attractive admissible as indicative of Sommers's state of mind.

Several witnesses then testified about Sommers's statements to them. Roukens testified that Sommers told her that she was a lesbian and was not attracted to men. They

18

talked about the attractiveness of women, and when Sommers talked about men, she would "shudder." Detective Camacho testified that Roukens told him that Sommers had told her that she had feelings for Debra. Hurtado testified that she and Sommers discussed sexual orientation, and Sommers told her that she liked women and was a lesbian. Sommers said that she felt free to talk to Hurtado because she was also a lesbian.

Sommers's neighbor testified that he and his wife socialized with Sommers at gatherings at the Bryants' apartment and at one such gathering, Sommers told him, "'You know, you know I'm gay.'"

B. Relevant law

1. *Standard of review*

The trial court is vested with broad discretion in determining the admissibility of evidence. (*People v. Karis* (1988) 46 Cal.3d 612, 637.) We review the trial court's determination as to the admissibility of evidence, including the application of exceptions to the hearsay rule, for abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 264; see also *People v. Valdez* (2012) 55 Cal.4th 82, 143.) Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

## 2. *Hearsay rule and its exceptions*

Evidence of a statement that was made other than by a witness while testifying at the hearing, and that is offered to prove the truth of the matter stated, is generally inadmissible hearsay. (Evid. Code, § 1200.) "A statement within the scope of an exception to the hearsay rule is not inadmissible on the ground that the evidence of such statement is hearsay evidence if such hearsay evidence consists of one or more statements each of which meets the requirements of an exception to the hearsay rule." (Evid. Code, § 1201.)

Two exceptions to the hearsay rule are at issue in the instant case, namely the state of mind exception and the declaration against interest exception. As defendant correctly points out, the prosecutor, as the proponent of the evidence, bore the burden of demonstrating the admissibility of Sommers's statements via these exceptions. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1177.)

### a. State of mind exception

Evidence Code section 1250 provides for an exception to the hearsay rule for evidence of the declarant's then-existing state of mind: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250.) Evidence Code section 1252 provides: "Evidence of a statement is inadmissible

20

under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

An essential element of Evidence Code section 1250 is whether the state of mind of the declarant is a fact in question and a relevant issue. (*People v. Noguera* (1992) 4 Cal.4th 599, 621.) The other two factors for consideration include the tendency of the statement to establish the state of mind of the declarant and the trustworthiness of the statement. (*People v. Majors* (1998) 18 Cal.4th 385, 404 [statements of intent to do a future act were admissible under Evid. Code, § 1250].)

b. Declaration against interest

Evidence Code section 1230 provides in relevant part: "Evidence of a statement by a declarant . . . is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made . . . created such a risk of making [her] an object of hatred, ridicule, or social disgrace in the community, that a reasonable [wo]man in [her] position would not have made the statement unless [she] believed it to be true."

"'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*People v. Grimes* (2016) 1 Cal.5th 698, 711; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 207.) In order for an out-of-court declaration to be against the declarant's social interest to such an extent that it becomes admissible under this section, both the content of the statement and the fact that the statement was made must be

21

against the declarant's social interest.  (*In re Weber* (1974) 11 Cal.3d 703, 721.)

  C. <u>Analysis</u>

    1. *State of mind exception*

  Sommers's statements that she was attracted to women were relevant to her state of mind during the last moments of her life.  Specifically, her statements to Roukens that she was a lesbian and that she "shuddered" when she talked about men explained her state of mind that she would not be attracted to a man sexually and thus would not consent to sex with a man. Sommers also told Roukens that she was attracted to Debra and that she thought Debra liked her.  In addition, Sommers also told Hurtado and her neighbor that she was a lesbian.  While the trial court did not specifically determine that Sommers's other statements to her friends about her sexual orientation were admissible under the state-of-mind hearsay exception, they also were relevant to explain Sommers's mindset that she was a lesbian and would not have consented to sex with defendant.

  Sommers's statements that she was a lesbian, and was not attracted to men, were offered to prove Sommers's "state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action."  (Evid. Code, § 1250, subd. (a)(1).)  Since defendant's sperm was inside Sommers's vagina at the time of her murder, her state of mind regarding whether she consented to having sex with him was an issue in this case. These statements were also "offered to prove or explain acts or conduct of" Sommers in the moments before she was murdered. (Evid. Code, § 1250, subd. (a)(2).)  Again, it is highly unlikely that a lesbian who "shuddered" at the thought of being with a man would have consensual sex with a man that she just met.  (*People*

*v. Guerra, supra,* 37 Cal.4th at p. 1113 [trial court properly admitted the victim's statement that she was afraid of the defendant because she believed he had come into her house while she was sleeping as evidence that she would not have consented to have sex with him].)

*People v. Griffin* (2004) 33 Cal.4th 536, 576–578 is instructive. In that case, the trial court admitted the deceased victim's statements that she intended to confront the defendant if he continued to molest her. The statement was properly admissible within the state-of-mind hearsay exception to prove the victim's future conduct of confronting the defendant, in accordance with the intent expressed in her statement, which prompted him to kill her. (*Id.* at p. 578.) Similarly, Sommers's stated feelings toward men were admissible to prove her future conduct of not consenting to sex with a man that she did not know.

And Sommers's statements were not made "under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.) Sommers made these comments about her sexual orientation to trusted friends with whom she felt comfortable. The fact that she made similar comments to several individuals also bolsters their credibility.

### 2. *Declaration against interest exception*

The trial court here was well within its discretion in finding that Sommers's statements about her sexual orientation "created such a risk of making [her] an object of hatred, ridicule, or social disgrace in the community," that a reasonable person "in [her] position would not have made the statement unless [she] believed it to be true." (Evid. Code, § 1230.) The trial court reasonably recognized that the social climate as to sexual orientation was

23

very different in the 1970's.[6]  Sommers was presumably aware that there might have been negative social consequences associated with declaring her sexual orientation.  And, there is no indication in the record that declaring Sommers's sexual orientation would improve her social standing.

Defendant claims that the circumstances under which Sommers made the statements indicated that she would not have felt any negative consequences.  After all, Roukens and Hurtado were also lesbians and were Sommers's friends, so it would be expected that Sommers would be more comfortable discussing her sexuality.  But that makes it even less likely that Sommers would have made false statements.  Regardless, there is nothing in the record indicating that Sommers's declaration to her neighbor, an apparently straight male acquaintance, could have benefitted her.  Rather, her statement to him included an inherent risk to her social interest and strengthened the trustworthiness of each of her statements of her sexual orientation.

D.  Harmless error

Assuming, without deciding that the trial court erred in admitting Sommers's statements about her sexual orientation, that error would have been harmless under any standard because defendant has not shown a reasonable probability of a different result absent the error.  (*People v. Marks* (2003) 31 Cal.4th 197, 226–227; *People v. Duarte* (2000) 24 Cal.4th 603, 618–619; *Cole*, *supra*, 33 Cal.4th at p. 1195.)  As set forth above, the evidence of

---

[6]     On appeal, defendant characterizes the 1970's differently, asserting that it was "famously a time of sexual experimentation."  The fact that defendant views the 1970's differently than the trial court did does not demonstrate an abuse of discretion.

24

defendant's guilt is overwhelming. He was conclusively identified through forensic DNA analysis as being the person who had sex with Sommers at the time she was killed. The forensic evidence also proved that Sommers did not get up after having sex; rather, she was either raped and then murdered, or beaten unconscious and/or killed and then raped.

We reject defendant's contention that there was an "absence of any physical evidence indicating that [he] had been in [Sommers's] apartment." The evidence conclusively established that defendant's DNA and sperm were present inside Sommers's vagina when she was found dead in her bedroom. And, the lack of sperm on Sommers's external genitalia indicates that she was killed in her bed after or immediately before being raped. The lack of physical injury to her vaginal area was reasonably explained by the advanced state of decomposition of her body by the time of the autopsy, and an expert testified that lack of injury does not preclude forcible rape. Sommers was on the bed, naked from the waist down, with sperm inside of her, which tended to prove she was raped. The disarray in Sommers's apartment, including her underwear and shorts lying on the floor in the hallway leading to her bedroom, indicates that there was a struggle just before she was raped and murdered. No evidence supports defendant's speculation that, because they lived within a mile of each other, they had consensual sex a short time before she died, presumably at another location.

Defendant also questions the conclusion that Sommers would not have sex with a man simply because she was a lesbian. Although being homosexual does not foreclose the possibility of having sex with a member of the opposite sex, whether Sommers in fact did is a question of the weight of the evidence, not

25

admissibility. (*People v. Wharton* (1991) 53 Cal.3d 522, 597.) And it has no bearing on whether Sommers's statements about her sexual orientation are admissible as hearsay exceptions.

Finally, for the same reasons, defendant's due process rights were not violated. (*People v. Lawley, supra,* 27 Cal.4th at p. 155 [ordinary rules of evidence do not infringe upon an accused's constitutional right to present a defense].)

III. *Alleged prosecutorial misconduct*

Defendant contends that the prosecutor committed misconduct[7] during closing argument that violated his constitutional rights to a fair trial. Specifically, he claims that the prosecutor attacked the defense for failing to present evidence that he and Sommers knew each other.

A. <u>Relevant proceedings</u>

During closing argument, defense counsel argued that it was possible that defendant and Sommers interacted because they lived about a mile from each other.

In rebuttal, the prosecutor noted that, once evidence was discovered showing that defendant lived near Sommers in 1980, the defense speculated that they had met someplace in the area. The prosecutor then explained that the defense does not have to present any evidence: "[T]he defense doesn't have to do anything at all. They don't have to do an opening statement; they don't have to question witnesses; they don't have to present any evidence; they don't have to do a closing argument." The prosecutor then noted that the defense made speculative statements but provided no evidence to support them: "But they

_____

[7] Prosecutorial error is a more apt description of defendant's claim. (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667.)

26

did here.  And they suggested some things to you.  And to support those things that they suggested to you such as the defendant knew the victim because they ran into each other in the neighborhood, they can call logical witnesses.  They can present logical evidence.

"Where are the photos of the defendant and the victim together?  Did you see them?  I didn't.

"Where are the friends of the [defendant] who knew them together?"

Defendant objected on the ground of "shifting the burden."  The trial court overruled the objection.

The prosecutor continued:  "Did anyone come here?  Any of his friends tell you that they knew each other?  No.

"Where are his family members to talk about how they knew the two of them together or how they heard her name, perhaps?  Or perhaps the mention of a woman who lived where she did?

"Counsel is trying to get all of you to believe or buy into the idea that they knew each other; that the victim knew him, and that she consented to this act of sexual intercourse.

"There is zero evidence that they knew each other, and there is zero evidence that she would consent to any type of sexual contact with [defendant].  And there's zero evidence of that because it's not true.

"She did not know [him]."

B.  Relevant law

""'[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.'"" (*People v. Hill*

(1998) 17 Cal.4th 800, 819.) "In *Griffin v. California* (1965) 380 U.S. 609, the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.)

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."""' (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"[W]hen [a] claim [of misconduct] focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa, supra*, 15 Cal.4th at p. 841; see also *People v. Sanders* (1995) 11 Cal.4th 475, 526.)

C. <u>Analysis</u>

Applying these legal principles, we readily conclude that the prosecutor did not err or commit misconduct. She merely observed that the defense failed to provide any evidentiary support for the claim that defendant and Sommers knew each

28

other and then had consensual sex; the statements were a proper commentary on the state of the evidence.[8] (*People v. Hughes* (2002) 27 Cal.4th 287, 372.) The comments did not improperly shift the burden of proof to the defense. (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1340 ["A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence"].)

Urging us to reverse, defendant asserts that because no one but him could have testified to a relationship between him and Sommers, the prosecutor's comments violated *Griffin v. California, supra*, 380 U.S. 609. After all, this was "not an ordinary case" because Sommers was murdered in 1980 and he had been incarcerated for an unrelated murder since 1981. But defendant's incarceration after Sommers's murder has nothing to do with whether he could provide supporting evidence for his claim that he had a relationship with Sommers before that incarceration.

### D. Harmless error

Even if the prosecutor had erred in her comments, that error would have been harmless as defendant cannot show any resulting prejudice under either state or federal law. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071; *People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

The trial court instructed the jurors that they must not draw any inference from the fact that defendant did not testify

---

[8] Defendant "acknowledges that the prosecutor did not actually suggest that [he] should have testified."

29

(CALCRIM No. 355), that the prosecution must prove every element of the charges against him beyond a reasonable doubt (CALCRIM Nos. 220, 224), and that neither side was required to call as witnesses all persons with knowledge of events (CALCRIM No. 300). We presume that the jurors understood and followed those instructions. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 172.) And, as discussed previously, the evidence that defendant raped and murdered Sommers was overwhelming.

It follows that any alleged prosecutorial error during closing argument was not prejudicial.

IV. *Cumulative error*

Finally, defendant contends that the cumulative effect of combined trial errors rendered his trial fundamentally unfair in violation of his due process rights, requiring reversal.

"Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

As set forth above, no errors occurred. And, even if there were, they were harmless. They did not combine to render this trial unfair. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [defendants are entitled to a fair trial, not a perfect one].)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT